UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

ODELL HUGHES,                              )
                                           )
        Plaintiff,                         )
                                           )
        v.                                 )        CIVIL NO.  3:12cv388
                                           )
SOUTHERNCARE, INC.,                        )
                                           )
        Defendant.                         )

OPINION AND ORDER

This matter is before the court on a motion for summary judgment [DE 52] filed by the

defendant, SouthernCare, Inc. ("SouthernCare"), on February 20, 2014.  The plaintiff, Odell

Hughes ("Hughes"), filed his response on June 25, 2014, to which SouthernCare replied on July

25, 2014.

Also before the court are three motions to strike.  On July 25, 2014, SouthernCare filed a

motion to strike [DE 72] several of Hughes' exhibits attached to his response to the motion for

summary judgment. Hughes' responded to the motion on August 4, 2014, to which SouthernCare

replied on August 14, 2014.

On July 28, 2012, Hughes filed a motion to strike Cindy L. Phillips' Declaration [DE 73].

SouthernCare responded to the motion on August 14, 2014, to which Hughes replied on August

16, 2014.

On August 7, 2014, Hughes filed a motion to strike [DE 75] statements in

SouthernCare's reply in support of its motion for summary judgment.  Although SouthernCare

responded to the motion on September 3, 2014, this response was stricken by the court on this

same date for being filed untimely without good cause. [DE 81]

Summary Judgment

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Not every dispute between the parties precludes summary judgment, however, since "[o]nly disputes over facts that might affect the outcome of the suit under the governing law" warrant a trial. Id. To determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003). A party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." Goodman v. Nat'l Sec. Agency, Inc., 621 F.3d 651, 654 (7th Cir. 2010).

Discussion

Hughes, who was formerly employed at SouthernCare, filed a complaint against SouthernCare alleging racial harassment/discrimination in violation of Title VII and also alleging various state law claims, including defamation, breach of contract and intentional infliction of emotional distress[1].  Hughes also requests punitive damages.

The court will first address SouthernCare's motion to strike.  In support of his Response to the Defendant's Motion for Summary Judgment, Hughes attaches as exhibits, an affidavit of himself and former SouthernCare employee Linda Holley, a statement of former SouthernCare

---

[1]  Hughes concedes that his intentional infliction of emotional distress, breach of implied contract, and Title VII hostile work environment claim should be dismissed.  Thus, those claims will not be discussed in this order.

employee Marie Hyman, and his annual performance appraisals. (dkt.# 69-1, 69-2, 69-3 and 69-4). However, the affidavits, statement, and performance appraisals are inadmissible in this summary judgment proceeding and will be stricken.

"Admissibility is the threshold question, because a court may consider only admissible evidence in assessing a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). "[A] party may not rely upon inadmissible evidence to oppose a motion for summary judgment." *Id.* With regard to affidavits, they must be made on personal knowledge, set forth facts as would be admissible in evidence, and the affiant must be competent to testify to the matters stated therein. *Reed v. Richards*, 1994 WL 259442, at *2 (7th Cir. 1994). Federal Rule of Civil Procedure 56(e) also requires affidavits "be made on personal knowledge ... set forth such facts as would be admissible in evidence, and ... show affirmatively that the affiant is competent to testify to the matters stated therein. Affidavits that are not under oath are not sufficient for purposes of opposing a motion for summary judgment. *Id*. Further, where an affidavit does not reveal the source of the author's awareness, the affidavit fails to establish the affiant's personal knowledge on the sourceless subject. *Ward v. First Fed. Sav. Bank*, 173 F.3d 611, 618 (7th Cir. 1999). Although the personal knowledge of the affiant may include inferences and opinions, the inference must be substantiated by specific facts. *Drake v. Minnesota Min. & Mfg. Co*., 134 F.3d 878, 887 (7th Cir. 1998). Further, documents that are not properly authenticated are not admissible in a summary judgment proceeding. *Gunnville*, *supra*,

Despite having been deposed over the course of two days, rather than cite to his deposition testimony in support of his Response, Hughes submitted an affidavit. "It is a well settled rule of this Court that a plaintiff cannot create an issue of material fact merely by

manufacturing a conflict in his own testimony by submitting an affidavit that contradicts an earlier deposition, and, in turn, defeat a defendant's motion for summary judgment Thus, when a conflict arises between a plaintiff's own sworn deposition and his sworn affidavit, the deposition testimony overrides statements made in the affidavit." *Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 532–33 (7th Cir. 1999) (quotations and citations omitted), overruled on other grounds, *Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013).

In paragraph three of his affidavit, Hughes claims that as a result of the June 2011 incident, he was suspended, and SouthernCare threatened not to pay him. However, nowhere in Hughes' explanation of the June 2011 incident in his deposition, did he describe this treatment. (Hughes Dep., p. 111, lns. 2-25; p. 112, lns. 1-24). Further, the corrective action plan that Hughes acknowledged he signed does not indicate that he was suspended, either with or without pay. (Hughes Dep., p. 102, lns. 1-4, Exh. 11). In paragraph three, Hughes also claims other employees involved in the June 2011 incident were not suspended. However, this is a conclusory statement, outside the scope of Hughes' personal knowledge, and the source of this conclusory statement is not identified in Hughes' affidavit.

In paragraph five, Hughes denies that he committed mileage fraud. However, he admitted in his deposition that he claimed miles for miles not driven. Hughes admits that he logged in to CellTrak as if he was in the office when he was really at home. (Hughes Dep., p. 230, lns. 19-25; p. 231, lns. 1-7). Hughes admits that he made hand corrections to his CellTrak record to reflect that on September 21, 2011, he was in the office from 2:30 to 3:30 and gave those corrections to Thacker, when he was actually never at the office. (Hughes Dep., p. 237, lns. 19-22). He also admits that on that same date he claimed he was in the office in the morning

from 9:41 to 11:13 when the CellTrak mapping showed he was not at the office. (Hughes Dep., p. 238, lns. 8-15). He also agreed that his last visit at 2:27 p.m., was not at the office or at a work-related visit, and was where his CellTrak phone remained for the next nine hours. (Hughes Dep., page 238, lns. 18-25) On September 23, 2011, Hughes admits he claimed mileage to the office in the morning, but was never in the office that morning. (Hughes Dep., p. 239, lns. 1-9) He also agreed that he was aware of the law and the policy that he could not claim mileage for the first and last stops of the day. (Hughes Dep., p. 243, lns. 3-8). Thus, the statement in his affidavit that he did not commit mileage fraud, directly conflicts with his deposition testimony, and should be stricken.

As to paragraph six, Hughes cannot turn Ms. Hyman's inadmissible statement (discussed below) into admissible evidence, simply by including it in his affidavit. For the reasons stated below, the statement is inadmissible hearsay and will be stricken. As to paragraph 10, for the reasons below, Hughes' performance appraisals are inadmissible hearsay and not properly authenticated. Hughes cannot make them admissible by referencing them in his affidavit, and they will also be stricken.

As to the admissibility of Linda Holley's affidavit, at issue in this case is Hughes' seeking mileage reimbursement under SouthernCare's CellTrak policy. SouthernCare's CellTrak and related mileage policy went into effect in August 2009. (Defendants' Response to Plaintiff's Interrogatories). Linda Holley's employment terminated with Southern Care in 2006. (Declaration of Cindy L. Phillips) [2]. As Linda Holley's employment terminated before

---

[2] Hughes' has filed a motion to strike Phillips declaration. Hughes argues that Phillips does not provide any evidence of how she has personal knowledge of the dates of Holley's employment. However, as the declaration itself indicates, Phillips is the Senior Vice President

SouthernCare's CellTrak and mileage policies went into effect, she has no personal knowledge as to those policies, or the enforcement thereof. Nor does she in her affidavit claim to have knowledge of the CellTrack policy. Thus her affidavit will be stricken.

As to Marie Hyman's statement, it is an unsworn statement, and offered for the truth of the matter. It is thus inadmissible hearsay, and will also be stricken. As to Hughes' annual performance appraisals, they will also be stricken. No witness has laid the foundation for the admissibility of these documents, and thus they are inadmissible.

Hughes claims that Hyman's unsworn statement is admissible pursuant to Fed. R. Evid. 807(a). As an initial matter, Rule 807(b) requires that a statement is only admissible under 807(a), if before a trial or hearing, the proponent gives the adverse party notice of the intent to offer the statement, and provides the declarant's name and address so that the adverse party has a fair opportunity to meet it. Thus, Rule 807, parts (a) and (b) together, contemplate the use of such statements only at an evidentiary hearing or trial, with pre-trial or pre-hearing notice to the opposing party. Thus Rule 807 is inapplicable to this summary judgment proceeding. Further, the Rule requires Hughes to provide SouthernCare notice of his intent to use the statement, which he did not do. Discovery is now closed, and SouthernCare now has no opportunity to "meet" the declaration and the summary judgment briefing is complete. Last, he claims that Rule 807 applies based on Ms. Hyman's refusal to cooperate in providing Hughes an affidavit. However, Hughes has not demonstrated that he was unable to acquire the sought after testimony

---

of Human Resources of Curo Health Services, who recently acquired SouthernCare, Inc. Moreover, Phillips states that she has personal knowledge of the matters in her declaration. As Phillips has met the requirements needed for a declaration by stating her job and that she has the requisite personal knowledge, the motion to strike will be denied.

through a deposition subpoena of Ms. Hyman before the close of discovery. Thus, Rule 807 does not save Hyman's statement from the hearsay rule.

As noted, at issue in this case is SouthernCare's policies and procedures for claiming mileage reimbursement through use of the CellTrak system at the time in question. Hughes claims that because Ms. Holley had knowledge of SouthernCare's mileage claim procedures at the time SouthernCare employed her, her affidavit should not be stricken. However, any mileage reimbursement policies that may have been in effect prior to the time in question and prior to the institution of the CellTrak policy are irrelevant to this lawsuit. As stated in its memorandum in support of its motion for summary judgment, SouthernCare had a written CellTrak policy that was instituted after Ms. Holley's employment ended with SouthermCare, which specifically states that mileage cannot be claimed for the first and last visits of the day. Thus, Ms. Holley's affidavit regarding any policies in effect prior to the time in question and prior to the CellTrak policy is irrelevant and will be stricken.

As to Hughes' statement that he was initially suspended after the June 8, 2011, incident, his description of this event is lacking from his deposition testimony in which he was given every opportunity to fully explain the June 8, 2011 incident. What Patricia Pancner may have said about his getting paid while at home is irrelevant to whether Hughes' affidavit is consistent with his own testimony. Thus, the statement will be stricken. As to whether or not others were suspended as a result of the June 8, 2011, incident, Hughes attached a second affidavit signed by himself stating that it was general knowledge that others involved in the incident were not disciplined. Hughes does not claim that he had access to any personnel files or disciplinary records to support this statement. While he claims that SouthernCare did not produce any

documents that it disciplined, suspended, or threatened others as a result of the June 2011

incident, he has not attached said discovery requests and responses to support this allegation. As

to Hughes' statement that SouthernCare threatened to not pay him after the June 2011 incident,

the evidence to which Hughes cites in the record in the form of the Pancner memo does not

constitute a threat. It speaks for itself and does not state or support his assertion. As for Hughes'

statements that he denied committing mileage fraud, he claims that SouthernCare misleads with

its use of two days worth of deposition testimony. However, Hughes repeatedly admitted in his

deposition that he was making claims for miles not driven which constitutes mileage fraud. Thus,

the above statements will be stricken from Hughes' affidavit.

The court will now turn to the motion for summary judgment.  The factual evidence

demonstrates that Hughes was hired by SouthernCare as a Chaplain on February 18, 2004.

(Complaint, ¶6). At the time he was hired, and on several occasions thereafter, Hughes

acknowledged in writing that his employment with SouthernCare was "at will," and that he

could be terminated at any time without notice for cause. (Hughes Dep. Exhibit C, p. 64,  65, 66,

67, 68, 76,  77, 78, 153; Hughes Dep. Exs. 2, 4, 7 and 14). Hughes also understood that his

employment with SouthernCare was not for a fixed period. (Hughes Dep., p. 65, lns. 11-17; p.

275, lns. 10-19).

Both before and during his employment with SouthernCare, Hughes signed numerous

documents indicating his agreement to conform to the policies and regulations of SouthernCare.

(Hughes Dep., p. 64, lns. 2-25, p. 65, lns. 1-10; p. 66, lns. 19-25; p. 67, lns. 1-25; p. 68, lns. 1-19;

p. 76, lns. 16-25; p. 77, lns. 1-25; p. 78, lns. 1-3; p. 153, lns. 13-25; p. 156, lns. 23-25; p. 157,

lns. 1-13; Hughes Dep. Exs. 2, 4, 7, 14 and 16). One specific policy to which Hughes agreed

was titled "Conduct and Working Environment." (Hughes Dep., p. 69, lns. 2-11; Hughes Dep. Ex. 3). The policy provided that employees must maintain a civil working environment that encourages mutual respect and professionalism, required employees to abide by SouthernCare's policies, provided that employees have the right to work without disorderly or undue influence from others, and that gross misconduct would be grounds for immediate termination. (Hughes Dep., p. 69, lns. 12-25; p. 70, lns. 1-25; p. 71, lns. 1-25; Hughes Dep. Ex. 3). Malicious or abusive language, and behavior and falsification of any documentation, were within the definition of gross misconduct, and Hughes was aware that a violation of these two policies could lead to immediate termination.. (Hughes Dep., p. 72, lns. 5-25; p. 73, lns. 2-15; Hughes Dep. Ex. 3).

Hughes also acknowledged that SouthernCare had an equal opportunity policy that it would comply with all provisions of Title VII of the Civil Rights Act of 1964, and that all decisions regarding employment would be made without regard to race, among other factors. (Hughes Dep., p. 88, lns. 23-25; p. 89, lns. 1-25; p. 90, lns. 1-15; Hughes Dep. Ex. 9). Pursuant to that policy, managers and supervisory staff enforce the policy and equal opportunity posters are posted. (Hughes Dep. Ex. 9). Supervisors also receive formal training on EEOC policies, and employees are advised of the EEOC policies through the handbook. (Hughes Dep. Ex. 9). SouthernCare's harassment and discrimination policies also are documented in its employee handbook. (Hughes Dep., p. 73, lns. 21-25; p. 74, lns. 1-25; p. 75, lns. 1-22; Hughes Dep. Ex. 6). This policy also prohibits harassment and discrimination based on an individual's race, prohibits conduct demeaning to another person, and provides an investigatory mechanism. (Hughes Dep. Ex. 6).

SouthernCare also had in place procedures for reporting incidents of harassment or other employment-related concerns. (Hughes Dep., p. 75, lns. 23-25; p. 76, lns. 1-12; p. 78, lns. 22-25; p. 79, lns. 1-18; Hughes Dep. Exs. 6 and 8). Hughes acknowledged that such grievances could even be voiced anonymously by calling a hotline without fear of retaliation. (Hughes Dep., p. 79, lns. 19-25; p. 80, lns. 1-6; Hughes Dep. Exs. 6 and 8). SouthernCare's policies also provided for an investigative and disciplinary mechanism for acts motivated by or related to any form of harassment or a violation of any of SouthernCare's policies. (Hughes Dep. Exs. 3, 6, and 8; Duren Dec. ¶6). Hughes admits that he never made any complaints to, or filed any grievances with SouthernCare during his employment in which he alleged that he was being treated differently based on his race. (Hughes Dep. p. 80, lns. 23-25; p. 81, lns. 1-8).

According to Hughes, on June 8, 2011, he became irritated with other SouthernCare employees when he could not find notebooks to complete paperwork. (Hughes Dep., p. 102, lns. 1-25; p. 103, lns. 1-25; p. 104, lns. 1-25; p. 105, lns. 1-25; p. 106, lns. 1-15). After a SouthernCare investigation, Hughes received an employee counseling form and an employee corrective action form from SouthernCare. (Hughes dep. p. 100, lns. 22-25; p. 101, lns. 1-25; p. 102, lns. 1-4; Hughes Dep., Ex 11 and 12; Defendant's Production Responses, ("RFP"), 1(a) SC00070-71). The employee counseling form indicated that Hughes was written up for violation of company policy and improper conduct and failure to meet standards of performance. (Hughes Dep. p. 102, lns. 1-4; Hughes Dep., Ex. 11). He was warned on the employee corrective action plan that failure to improve would result in discipline up to and including termination. (Hughes Dep. p. 101, lns. 15-25; Hughes Dep., Ex. 12).

Patricia Pancer ("Pancer"), a SouthernCare clinical director, performed an investigation

into the incident, and obtained statements from the involved SouthernCare employees, Joe Emmerth ("Emmerth") Mary Beth Beutter ("Beutter"), Deb Douglas ("Douglas"), Linda Thacker ("Thacker") and Marie Hyman ("Hyman"). (RFP 1(a) SC00074-80; Hughes Dep., p. 113, lns. 8-25; p. 114, lns. 1-14; p. 120, lns. 12-19; Hughes Dep. Ex. 13).

Beutter initially reported the incident to Pancer, explaining that Hughes had become enraged in the morning, and was taking it out on several of the staff in a hostile and threatening manner, and that one of the nurses was crying and was probably going to resign over the incident. (RFP 1(a) SC00074). During this incident, Beutter described Hughes as getting "louder and louder. He was yelling." (Hughes Dep., Ex. 13). Douglas described Hughes as "jumping all over her," going "ballistic," and being irrational to the point where she lost all respect for him. (Hughes Dep, Ex. 13). She said that she would not feel comfortable going to Hughes if needed. (Hughes Dep, Ex. 13). Emmerth described Hughes as confrontational, aggressive and forceful. (Hughes Dep, Ex. 13). He also believed Hughes was alienating the team members. (Hughes Dep, Ex. 13). Thacker described Hughes as being angry and going off on Beutter. (Hughes Dep, Ex. 13). She related that his voice kept raising, and he was moving closer and closer to her. (Hughes Dep, Ex. 13). Despite requests, he would not calm down. (Hughes Dep, Ex. 13). Hughes also caused Douglas to start crying. (Hughes Dep, Ex. 13). Thacker said no one could redirect Hughes, and she had never seen him act that badly before. (Hughes Dep, Ex. 13)

Hughes admits that he became irritated over the situation, and he wanted to express his irritation to his co-workers. (Hughes Dep., p. 108, lns. 21-25; p. 109, lns. 1-6) Hughes admitted to Pancer that he could have handled the situation better. (Hughes Dep., p. 111, lns. 4-25; p. 112, lns. 1-3) Pancer said he would have to apologize to those involved, and Hughes volunteered to

apologize to the whole office. (Hughes Dep., p. 112, lns. 3-11) Pancer advised Hughes that if he conducted himself like that in the future, he would be terminated, and Hughes agreed to this admonition because he knew he could have handled the situation better. (Hughes Dep., p. 112, lns. 1-25; p. 113, lns. 1-4) Pancer also memorialized her conversation with Hughes in an email, dated June 13, 2011, to other SouthernCare employees. (RFP 1(a) SC00073). Her email stated:

Odell met with me first thing this morning. He brought up his behavior last week on his own initiative and apologized for his "episode of outrage toward the staff". He stated he had lost sight of why he was here and he took to heart our conversation on Thursday and he wanted to apologize to the team. I told him that that was an excellent idea in fact…and I eased right into the Counseling and the Corrective Action Plan. He went on to state that he has past issues of anger problems and "hasn't experienced uncontrolled anger like that in years". He did not feel his reaction at work had anything to do with work and he was very apologetic. He is clear that he will be terminated if it happens again and assured me that it will not. He stated that he spent the entire weekend on his retreat working through his issues and feels confident he is on the right track again. He signed the forms without any hesitation.

Hughes acknowledged that Pancer's investigation was performed pursuant to SouthernCare's grievance policy because there had been a complaint. (Hughes Dep., p. 113, lns. 16-25; p. 114, lns. 1-14). Hughes admitted that the employee statements that were taken from the SouthernCare employees were obtained pursuant to SouthernCare's investigation, and that he too was allowed to submit his side of the story. (Hughes Dep., p. 120, lns. 12-23). Hughes also admits that SouthernCare followed its policy in investigating this incident. (Hughes Dep., p. 121, lns. 7-13; p. 122, lns. 12-16). Although Hughes testified that others have gotten loud and expressed themselves in meetings and were not written up, he admitted that he never complained to anyone at SouthernCare about these incidents. (Hughes Dep., p. 122, lns. 20-25; p. 123, lns. 1-16). With respect to other non-African-American employees who had outbursts similar to his without repercussions, he has no personal knowledge that anyone ever complained to

SouthernCare about those incidents. (Hughes Dep., p. 127, lns. 12-21, p. 130, lns. 5-16). Hughes admitted that SouthernCare could not investigate a grievance if no grievance was ever made. (Hughes Dep., p. 123, lns. 23-25; p. 124, ln. 1). SouthernCare maintains that Hughes has no evidence that he was given the write-up because of his race. (Hughes Dep., p. 125, lns. 5-16). SouthernCare further contends that as a result of this incident and write-up, Hughes did not suffer any reduction in compensation, fringe benefits, change in duties or job conditions, transfer, or other financial terms of employment. (Duren Dec., ¶7).

SouthernCare's hospice services are provided to a wide variety of clients, including those residing at home, nursing homes, and hospitals. (Duren Dec., ¶8). Since most of its services are delivered in the community, SouthernCare employees use their own personal vehicles to travel on SouthernCare business, and are reimbursed for mileage expenses by SouthernCare. (Duren Dec., ¶9). Several years after Hughes began his employment with SouthernCare, it started a CellTrak system. (Hughes Dep., p. 168, lns. 6-14). CellTrak is a software application installed on an employee's SouthernCare issued cell phone that, among other things, tracks the employee's time and geographical location for purposes of mileage reimbursement. (Defendant's Answer to Plaintiff's Complaint, ¶11; Hughes Dep., p. 174, lns. 20-23). CellTrak records a variety of information depending on the employee's position with the company, such as medical records, employee schedules, travel time and mileage for purposes of financial reimbursement for the employee's use of his/her personal vehicle when traveling on company business. (Plaintiff Complaint, ¶12; Defendant's Answer ¶12). SouthernCare employees used CellTrak to track their office visits and mileage through a log-in and log-off procedure using location based codes. (Hughes Dep., p. 174, lns. 20-25; p. 175, lns. 1-25; p. 176, lns. 1-7).

Hughes was not provided with a home code to log into CellTrak, and Hughes never asked for one. (Complaint, ¶19; Hughes Dep., p. 186, lns. 16-18) There was also a mapping component to the CellTrak system, and SouthernCare employees were required to keep their CellTrak phone with them at all times so that the mapping component would be able to document where they were located. (Hughes Dep., p. 176, lns. 18-24; p. 179, lns. 4-24; p. 180, lns. 9-14; p. 219, lns. 19-25; p. 220, ln. 1).

The CellTrak system was introduced to SouthernCare employees through meetings. (Hughes Dep., p. 168, lns. 15-19). At some point, Hughes also received a written policy outlining SouthernCare's CellTrak procedures. (Hughes Dep., p. 173, lns. 14-23; Hughes Dep. Exs. 17 and 24). Southern Care's CellTrak policy included a directive, which Hughes understood, that "[employees] are not reimbursed mileage from home to the first visit or to home from the last visit during a normal workday." (Hughes Dep., p. 180, lns. 18-25; p. 181, lns. 1-6; Hughes Dep. Exs. 17 and 24). SouthernCare employee Thacker handled the CellTrak recordkeeping and was the individual responsible for making CellTrak corrections. (Hughes Dep., p. 209, lns. 1-25; p. 210, ln. 1). Hughes understood that the CellTrak mileage documents he submitted had to be accurate, and that falsification of documents would lead to termination. (Hughes Dep., p. 225, lns. 8-25; p. 226, lns. 1-4). Hughes acknowledged that no one said he could be reimbursed for mileage that he never drove, and if he submitted documentation requesting mileage reimbursement for miles he never drove, he knew that would constitute falsification of documents and would be grounds for termination. (Hughes Dep., p. 227, lns. 6-17).

Hughes claims that he would sometimes start his day by making calls at home, and

sometimes start his day from the office. (Complaint, ¶¶13, 14). He claims that, contrary to

SouthernCare's written policy, his former supervisor gave him permission to claim mileage from

the office, even when he started his day at home, and he did claim mileage in this manner.

(Complaint, ¶¶15-16).

Prior to his termination from SouthernCare, Pancer determined in September of 2011 that

Hughes had submitted mileage reimbursement for miles he did not drive. (Hughes Dep., p. 228,

lns. 14-21) Specifically, she determined that he had committed mileage fraud because he made a

mileage reimbursement request for mileage from the SouthernCare office to his first visit of the

day, while he was actually home when he left for his first visit. (Hughes Dep., p. 229, lns. 4-9,

24-25; p. 230, lns. 1-18).

During Pancer's investigation, she examined Hughes' CellTrak records, and determined

they demonstrated mileage fraud. (RFP 1(a) SC00060-67; Hughes Dep., p. 251, lns. 2-14,

Hughes Dep. Ex. 28). Pancer consulted with SouthernCare employee Bryant, who agreed with

her CellTrak findings, and she reported her findings to Theresa Bush ("Bush"). (RFP 1(a)

SC00068). Pancer also documented, in a memo, SouthernCare's investigation into the mileage

issue. (RFP 1(a) SC00006). Pancer's memo states as follows:

> Odell was terminated for inappropriate behavior and poor performance. He had
> received a final warning in June for failure to meet standards of performance and
> conduct. Attached is his termination information and his final warning. Odell
> submitted hand written changes to his celltrak to include office time that he forgot
> to enter and the subsequent mileage that he felt owed for his last visit that didn't
> show up. He wrote down that he was at the office from 230 to 330pm. He gave it
> to Linda so she could get it approved to be changed. Linda gave it to me because
> he was never at the office that day at all and she wanted to call it to my attention.
> He also entered for the same day that he was at the office that day in the morning
> from 9:41am to 11:13am. When you pull up his mapping for that date, 9/21/11, it
> shows that he clearly was not near the office that day. His tracking is about every
> 2  minutes so Bryant said it's very accurate. His end visit at 2:27p which was not

the office or a work related visit was where the phone remained for about the next 9 hours. He also logged in as being at the office on 9/23/11 at 9:29am and logged out at 1:32pm. He did not leave his home until 10:48am. His first visit of the day wasn't until 1:38pm. He again claimed mileage and did not go to the office that morning at all as claimed. He admitted to Erica and I that he knew what he did was wrong and he was very embarrassed. He kept repeating how embarrassed he was. He stuttered alot and tried to find excuses but couldn't. He had been educated on cell trak like everyone else and has a celltrak phone agreement in his file. He verbally acknowledged that he was aware of the law and the policy that he could not claim mileage for first and last stops of the day. When I pointed out that he had acknowledged knowing what he did was not right he tried to justify it by claiming everyone else does the same thing, including myself. I let him know that I was not aware of that and that right now we were discussing Odell. I reiterated that he was being terminated for inappropriate behavior and poor performance as we had already addressed poor performance and conduct as a final warning in June. He was tearful and embarrassed. He waited until his peers left for the day and we assisted him with his things. He even hugged me twice before he left.

Pancer's above memo was also transmitted to SouthernCare employee Lisa Taylor ("Taylor"). (RFP 1(a) SC00002). In that email, Ms. Pancer added:

> Linda, Erica nor myself are not aware of anyone else in Southbend misusing CellTrak or not following policy. I have an iphone so that comment he made about my CellTrak use doesn't even apply.

Both Bush and Taylor were SouthernCare employees who were involved in Hughes' termination and unemployment claim, and needed to know the results of Pancer's CellTrak investigation. (Duren Dec., ¶12).

Once Pancer became aware that Hughes was claiming mileage for miles he had not driven, she discussed the results of her investigation with Richard Duren, who authorized the termination of Hughes for inappropriate behavior and poor performance. (Duren Dec., ¶10; (RFP 1(a) SC0001). As indicated above, the evidence shows that neither Pancer nor Duren was aware that any other employees were violating SouthernCare's CellTrak policy and claiming mileage not driven as Hughes had done, and who were not terminated. (Duren Dec., ¶11, RFP

1(a) SC00001 and 2).

On September 30, 2011, Pancer communicated to Hughes that he was being terminated for committing mileage fraud and for a prior write up. (Hughes Dep., p. 231, lns. 14-25; p. 233, lns. 9-25; p. 234, lns. 1-4). Hughes' termination was documented in an employee counseling form indicating, in part, a violation of policy 131 regarding employee conduct. (Hughes Dep. 235, lns. 9-24; Hughes dep. Ex. 27; (RFP 1(h) SC0000243). Hughes has no personal knowledge that anyone at SouthernCare told anyone outside of SouthernCare about the reasons for his termination or the incidents leading up thereto. (Hughes Dep., p. 277, lns. 22-25; p. 278, lns. 1-5). Further, when asked if Pancer's communication of the reasons for his termination were motivated by ill will, he responded that he was just upset and embarrassed by his termination. (Hughes Dep., p. 276, lns. 20-25; p. 1-21).

In his deposition, Hughes admits that he submitted a claim for mileage reimbursement for miles he did not drive, because he logged in to CellTrak as if he was in the office when he was really at home. (Hughes Dep., p. 230, lns. 19-25; p. 231, lns. 1-7). Hughes admits that he made hand corrections to his CellTrak record to reflect that on September 21, 2011, he was in the office from 2:30 to 3:30 and gave those corrections to Thacker, when he was actually never at the office. (Hughes Dep., p. 237, lns. 19-22). He also admits that on that same date he claimed he was in the office in the morning from 9:41 to 11:13 when the CellTrak mapping showed he was not at the office. (Hughes Dep., p. 238, lns. 8-15). He also agreed that his last visit at 2:27 p.m., was not at the office or at a work-related visit, and was where his CellTrak phone remained for the next nine hours. (Hughes Dep., page 238, lns. 18-25) On September 23, 2011, Hughes admits he claimed mileage to the office in the morning, but was never in the office that morning.

(Hughes Dep., p. 239, lns. 1-9) He also agreed that he was aware of the law and the policy that he could not claim mileage for the first and last stops of the day. (Hughes Dep., p. 243, lns. 3-8).

When asked who else, other than Hughes, submitted claims for mileage reimbursement for mileage that he or she had not driven, Hughes initially responded, no one. (Hughes Dep., p. 243, lns. 18-21; p. 224, lns. 4, 12-14) Hughes later identified in his deposition two other SouthernCare employees who he believed worked from home and punched in as if they were working in the office and submitted requests for mileage, and who didn't get fired: Tamika Kelly ("Kelly") and Rhonda Brown ("Brown"), both African-American. (Hughes Dep., p. 245, lns. 23-25; p. 246, lns. 1-7 p. 249, lns. 20-23). However, Hughes admitted he had no information that Kelly or Brown were putting into CellTrak that they were in the office when they were really at home, and had no information that either was putting in requests for mileage reimbursement for miles they never drove. (Hughes Dep., p. 249, lns. 4-19, p. 258, lns. 24-25; p. 259, lns. 1-15; p. 268, lns. 1-5). Hughes further identified others he believed were logging in at the office when they were actually at home: Jonathan George; Shanna Griggs and Beth Krider. However, Hughes testified that these individuals, and again also Brown and Kelly, never told Hughes that they submitted and were reimbursed for mileage they did not drive. (Hughes Dep., p. 260, lns. 9-24; p. 267, lns. 10-25; p. 268, lns. 1-25; p. 269, lns. 1-4; p. 274, lns. 16-25; p. 275, lns. 1-2;). Hughes admits that he has no information that anyone else other than himself was logging in as being in the office when they were at home and submitting requests for mileage reimbursement they did not drive. (Hughes Dep., p. 249, lns. 24-25; p. 250, lns. 1-4). Further, prior to Hughes' termination, SouthernCare fired four Caucasian employees in Hughes' office in 2005 to 2008 for document falsification, including one for mileage fraud: M.G.; R.B.; KC.; and V.H. (Duren Dec.,

¶13)

In his Complaint, Hughes alleged certain misconduct regarding Emmerth, who was an
adjunct chaplain whom Hughes supervised. (Complaint, ¶ 22, subparagraph (f) and (g)).
However, Hughes has no personal knowledge that, as alleged, anyone at SouthernCare ever told
a patient not to use Hughes as a chaplain because he was African-American. (Hughes Dep., p.
87, lns. 10-17; p. 96, lns. 17-24). Also, Hughes never heard anyone tell a patient that the patient
should not use the chaplain services because the SouthernCare chaplain was African-American.
(Hughes Dep., p. 86, lns. 1-4). SouthernCare never demoted Hughes because patients may have
chosen the other chaplain. (Hughes Dep., p. 99, ln. 25, p. 100, lns. 1-3). Further, he never lost
any benefits or wages even assuming that patients chose the other chaplain. (Hughes Dep., p.
100, lns. 1-16).

SouthernCare first requests summary judgment on Hughes' disparate
treatment/discrimination claim.  SouthernCare claims that Hughes has not presented any direct
evidence of racial discrimination. Thus, he must proceed under the indirect method of proof [3].  In
proceeding under the indirect method, Hughes must first make out a prima facie case of
discrimination by demonstrating that (1) he is a member of a protected class; (2) he was meeting
his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4)

---

[3]  Hughes claims that the direct/indirect mtehods of proof are not longer applicable due to
the Seventh Circuit's ruling in *Perez v. Thorntons, Inc.*, 731 F.3d 699 (7th Cir. 2013).  In *Perez*,
the majority stated that:  "[W]e recognize and join the majority of active judges in this circuit
who have opined that the time has come to jettison the 'ossified direct/indirect paradigm' in
favor of a simple analysis of whether a reasonable jury could infer prohibited discrimination."
However, after making this pronouncement, the *Perez* majority expressly went on to analyze
Perez's national origin and gender discrimination claims under the direct and indirect methods.
This court will do likewise.

other similarly situated employees, not in his protected class, were treated more favorably. *Alexander v. Casino Queen, Inc*, 739 F.3d 972, 979 (7th Cir. 2014). If Hughes establishes a prima facie case, then SouthernCare has the burden to articulate a legitimate, nondiscriminatory reason for the adverse employment action, which if believed, would lead to the conclusion that Hughes' race was not the cause of the employment action. *Id.* at 979. If SouthernCare meets this burden, Hughes must show that the proffered reason was pretextual.

Hughes' main complaints arise from the June 2011 incident, and his termination for mileage fraud in September 2011. As to the June 8, 2011, incident, Hughes alleges in his Complaint that he was subjected to abuse from a coworker, was disciplined and was forced to apologize. (Complaint ¶22(a)). The undisputed evidence from his co-workers demonstrates that he was the abuser, and Hughes even admits that he could have handled the situation differently. He thus cannot show that he was meeting SouthernCare's legitimate expectations. He also could not identify other SouthernCare employees who were subject of an employee grievance for similar conduct, and who were not disciplined. Therefore, he has failed to set forth a prima facie case of discrimination based on this incident. Further, for the same reasons, he cannot show that SouthernCare's reasons for disciplining him were pretextual.

As to his termination for mileage fraud, again, Hughes cannot show that he was meeting SouthernCare's legitimate expectations, and even if he could, he cannot show that the reason SouthernCare terminated him was pretextual. At the time of Hughes' termination, SouthernCare had a written policy that prohibited SouthernCare employees from claiming mileage to and from home for their first and last visits of the day. Hughes violated that policy by documenting that he traveled from the office to his first visit and claiming mileage for that travel, when he was never

actually in the office. Further, although Hughes tries to identify others, similarly situated, who made mileage reimbursement requests in the same manner as he did, Hughes admits that he has no information that anyone else was logging in as being in the office when they were at home and submitting reimbursement requests for mileage they did not drive. (Hughes Dep., p. 249, lns. 24-25; p. 250, lns. 1-4). The comparative evidence also demonstrates that Caucasian employees were terminated for submitting falsified documentations. In addition, neither Pancer nor Duren, as decisionmakers, were aware that other SouthernCare employees were claiming mileage in the same manner as Hughes, and who were not terminated, which defeats Hughes' similarly situated argument. *Brasic v. Heinemann's Inc. Bakeries*, 121 F.3d 281, 286 (7th Cir. 1997)(no evidence that management did not uniformly enforce rules when it was not aware of other employees violating no hitting rule); *Wallace v. Methodist Hospital System*, 271 F.3d 212, 221 (5th Cir. 2001)(other nurses not similarly situated where supervisors did not know they were violating hospital operating room procedures); *Hamilton v. Coffee Health Group*, 949 F.Supp.2d 1119, 1157 (N.D. Ala. 2013)(other employee not similarly situated where employer not aware of other employee's sending itemized billing statement to the wrong patient); *Vickers v. Federal Express Corp.*, 132 F.Supp.2d 1371, 1380 (S.D. Fla. 2000)(other employee not similarly situated where management did not know that other employee was using improper out of service codes.) Thus, Hughes cannot state a prima facie case for race discrimination related to his termination, and also cannot show that SouthernCare's proffered reason therefore was pretextual.

As to Hughes' other complaints about Emmerth, the other Chaplain, these incidents cannot support his disparate treatment claim. Adverse employment actions "generally fall into three categories: (1) termination or reduction in compensation, fringe benefits, or other financial

terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge." *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453–54 (7th Cir.2011). To be actionable, an employment action "must be a significant change in employment status ... or a decision causing a significant change in benefits." *Alexander* at 979, citing *Lewis v. City of Chicago.*, 496 F.3d 645, 653 (7th Cir.2007) (citation omitted). Until his termination from SouthernCare, Inc., Hughes did not suffer any reduction in compensation, fringe benefits, change in duties or job conditions, transfer, or other negative changes to the financial terms of employment. He admitted in his deposition that he suffered no adverse employment action as a result of any patients being steered to Emmerth.

Further, Hughes cannot demonstrate that Emmerth was a similarly situated individual, as Emmerth was never the subject of any grievances, and was never suspected of mileage fraud by SouthernCare. As indicated above, the comparative evidence actually shows that SouthernCare terminated other Caucasian employees for falsifying documents, including one for mileage fraud.

As to his proof under the indirect method of proof, Hughes claims he was meeting SouthernCare's legitimate expectations because (1) other employees used their home as their starting point; (2) April Henry told employees they could claim mileage from their home; (3) he did not know he could have a home code until after he was terminated; and (4) SouthernCare rated him highly on his most recent performance evaluation.

As to other employees using their homes as the starting point, Hughes relies on Linda Holley's inadmissible declaration and Marie Hyman's inadmissible statement to support this conclusion. SouthernCare's undisputed evidence shows that neither Linda Thacker, Erica Sholty,

Patricia Pancner, or Richard Duren, who were all involved in the investigation of Hughes' improper mileage claim, were aware that any other SouthernCare employee was claiming mileage in the manner in which Hughes claims April Henry told him. (RFP 1(a) SC00002; Duren Dec.). Thus, even if April Henry had told Hughes he could claim mileage in a manner which resulted in his termination, the decision makers were not aware of it, and thus could not have discriminated against Hughes on the basis of his race when they terminated him. See *Chism v. Con-Way Freight, Inc.*, 2009 WL 3111274 at *12 (N.D.Ind. 2009), citing to *La Montagne v. American Convenience Prod., Inc.*, 750 F.2d 1405, 1412 (7th Cir. 1984) ("focus of inquiry for claim of discriminatory discharge is on the motivation of the individual or individuals who actually made the decision").

As to the allegations Hughes could have used a home code, there is no evidence in the record that SouthernCare did not tell Hughes he could have a home code until after his terminated employment. There is no evidence in the record that SouthernCare ever told him he could have a home code. As to his performance evaluations, those came prior to the June 2011 incident and his September 2011 fraudulent mileage. Thus, the prior reviews do not demonstrate any improper motive for Hughes' termination.

As to Hughes's claim that SouthernCare treated him differently than others, he claims (1) SouthernCare permitted others to use their home as a starting point; (1) SouthernCare never offered Hughes a home code; (3) and others were not disciplined after the June 8, 2011, incident. As to others using their home codes, again Hughes supports his claim only with the inadmissible statements of Holley and Hyman. As to offering Hughes a home code, he cites to no evidence that others similarly situated to him as a chaplain, and of a different race, were offered a home

code.

As to the June 8, 2011, incident, Pancner decided to have him stay home for a day after other SouthernCare employees complained about his conduct. Hughes also was permitted to give Pancner his side of the story before the day he was home. Further, Hughes admits that he was at fault for the incident and agreed to apologize to the entire office. Pancner's email memorializing her meeting with Hughes also documents Hughes' admission over his episode of outrage to the staff. Hughes further admits that he has no evidence that he was given the June 2011 write-up based on his race, and that he received the write-up after Pancner conducted an investigation pursuant to SouthernCare's policy, which included two opportunities for him to tell his side of the story.

As to comparators, Hughes claims that SouthernCare cursorily states in Duren's Declaration that it fired other Caucasian employees for submitting falsified documentation, which is different from mileage fraud. However, Hughes fails to mention that Duren's declaration goes on to say that one of those Caucasian employees was terminated for committing mileage fraud. (Duren Dec., ¶13).

Even if, as Hughes claims, he has stated a *prima facie* case of discrimination, SouthernCare has shown that its actions were not based on Hughes' protected status. Hughes claims he can show pretext because he was meeting SouthernCare's legitimate expectations yet was treated differently. Hughes tries to offer further evidence of pretext by again claiming that SouthernCare's reasons for his termination varied. However, all the admissible evidence in the record shows that Hughes was terminated based on the June 2011 write-up and his mileage claim in September 2011. Hughes also admits that Patricia Pancner stated to him that those events were

the two reasons for his termination.

Hughes also claims that SouthernCare's expectations were illegitimate, because it allowed others to report their mileage from home and did not allow him to do so. Again, none of the individuals involved in investigating Hughes' mileage claim in September 2011, or those involved in the decision to terminate him, were aware that others were claiming mileage in the same manner as Hughes. Their expectations as to how Hughes was to claim mileage were no different than their expectations as to how other SouthernCare employees were to claim mileage. Thus, there is no evidence of pretext and Hughes fails to support a claim under the indirect method.

Hughes claims, however, that he has direct evidence of discrimination. Yet, the evidence on which he relies is merely a mosaic and compilation of circumstantial evidence. Hughes first claims that the timing of his June 2011 write-up and September 2011 termination was suspicious because he received positive performance evaluations for seven years prior thereto without issue, and was never disciplined prior thereto.

As an initial matter, the court will not consider performance reviews in deciding this motion for summary judgment, because they are inadmissible, as explained above in the ruling on SouthernCare's motion to strike. However, even if considered, none of the annual performance appraisals that Hughes attaches to his Response came after his June 2011 write-up, or after he committed mileage fraud. Hughes' performance *at the time* of the employment action is what is relevant. *Moser v. Indiana Department of Corrections*, 406 F.3d 895, 901 (7th Cir. 2005). Earlier reviews have limited probative value in assessing an employee's performance at the time of an adverse employment action. *Id*. In *Moser*, the court rejected the employee's

argument that her 20 year exemplary employment record showed she was demoted on the basis of gender, where she admitted committing the acts for which she was demoted and written up. See also, *Burks v. Wisconsin Department of Transportation*, 464 F.3d 744, 753 (7th Cir. 2006); *Fortier v. Ameritech Mobile Communications, Inc*., 161 F.3d 1106, 1113 (7th Cir. 1998). Hughes is no different than the plaintiff in *Moser*, as he too admitted the inappropriateness of his actions in June 2011 that resulted in his write-up.

Hughes admitted that he became irritated over the situation, and he wanted to express his irritation to his co-workers. (Hughes Dep., p. 108, lns. 21-25; p. 109, lns. 1-6) Hughes even admitted to Patricia Pancner, his supervisor, that he could have handled the situation better. (Hughes Dep., p. 111, lns. 4-25; p. 112, lns. 1-3) Pancner said he would have to apologize to the other SouthernCare employees involved, and Hughes volunteered to apologize to the whole office. (Hughes Dep., p. 112, lns. 3-11) Pancner also advised Hughes that if he conducted himself like that in the future, he would be terminated, and Hughes agreed to this admonition because he knew he could have handled the situation better. (Hughes Dep., p. 112, lns. 1-25; p. 113, lns. 1-4).

Notably, Hughes has no evidence himself that he was written up on the basis of his race. (Hughes Dep., p. 125, lns. 5-16). His lack of prior write-ups and prior performance reviews simply do not prove he was discriminated against on the basis of race related to the June 2011 incident. Lacking evidence, Hughes struggles to raise an inference from other sources. For example, Hughes also claims that he can show proof of discrimination because SouthernCare gave "ambiguous" statements as to why it fired him. He claims that, on one hand, SouthernCare said it fired him because he was insubordinate and displayed inappropriate behavior, and on the

other hand, SouthernCare said he committed mileage fraud. Hughes has simply "cherry-picked" those two phrases from the evidence in the record, and has ignored the evidence as a whole, which clearly demonstrates Hughes was terminated as a result of the June 8, 2011, incident, and because of his mileage fraud in September 2011. In *Zaccagnini* and *O'Neal,* to which he cites, the employers came up with completely new reasons for the employee's termination after the fact. *Zaccagnini v. Charles Levy Circulating Co*., 338 F.3d 672 (7th Cir. 2003); *O'Neal v. City of New Albany*, 293 F.3d 998 (7th Cir. 2002). In *O'Neal*, the new reason appeared first in the defendant's reply summary judgment brief. Those cases and their holdings have no applicability to this case. Here, the evidence that was created at the time of Hughes' termination, demonstrates that Hughes was terminated for the June 2011 incident and his September 2011 mileage claim.

In an email Pancner wrote immediately after the June 2011 incident, she made it clear Hughes would be terminated for further conduct violations. (Defendant's RFP, 1(a) SC00073). Hughes also admits that on September 30, 2011, Pancner communicated to Hughes that he was being terminated for committing mileage fraud and for a prior write up. (Hughes Dep., p. 231, lns. 14-25; p. 233, lns. 9-25; p. 234, lns. 1-4). The documents SouthernCare's submitted in support of its Motion for Summary Judgment as to Hughes' termination make clear the reasons for Hughes' termination. During Pancner's investigation, she examined Hughes' CellTrak records and an explanation thereof as to why they demonstrated mileage fraud. (RFP 1(a) SC00060-67; Hughes Dep., p. 251, lns. 2-14, Hughes Dep. Ex. 28). Pancner consulted with SouthernCare employee Bryant, who agreed with her CellTrak findings, and she reported her findings to Theresa Bush. (RFP 1(a) SC00068). Pancner also documented in a memo

SouthernCare's investigation into the mileage issue. (RFP 1(a) SC00006).

Pancner's memo also was transmitted to SouthernCare employee Lisa Taylor ("Taylor"). (RFP 1(a) SC00002). In that email, Ms. Pancner added, "Linda, Erica nor myself are not aware of anyone else in SouthBend misusing CellTrak or not following policy. I have an iphone so that comment he made about my CellTrak use doesn't even apply." While SouthernCare may have used different words to characterize the reasons for Hughes' termination, the record as a whole makes it clear that he was fired for the prior June 2011 write-up and for a violation of SouthernCare's CellTrak and mileage policies.

Hughes also admits that he submitted a claim for mileage reimbursement for miles that he did not drive. (Hughes Dep. p. 230, lns. 19-20; p. 231, lns. 1-7). Hughes tries to argue that these citations to his deposition are inadmissible because his answer "yes" to a question came after an "asked and answered" objection made by his counsel. First, "asked and answered" is not a viable objection, and even if it were, objections that do not go to privilege or trade secret are not a basis for a witness not to answer, and in fact, Hughes did answer.

Next, Hughes claims that there are other "bits and pieces" that demonstrate discriminatory intent. He claims that SouthernCare gave some employees CellTrak home codes, but did not give him a code. He relies on a statement from Marie Hyman that she had a home code. However, as explained in SouthernCare's Motion to Strike, her statement is inadmissible and should not be considered. Further, her statement identifies her as registered nurse, who obviously has different duties and responsibilities than does a chaplain. Hughes was a chaplain, and is thus not sufficiently comparable to Hyman. It is well settled that for purposes of Title VII comparisons, members of the comparison group must be comparable to the plaintiff in all

material respects. *Crawford v. Indiana Harbor Belt R. Co.*, 461 F.3d 844, 846 (7th Cir. 2006)

Thus, Hyman is not comparable to Hughes. Further, Hughes offers no evidence as to whether

the other two African-Americans, and a Caucasian chaplain, working in the Mishawaka

office were offered home codes.

Hughes also refers to what he calls the "suspicious timing" of Hughes' termination. For

the reasons SouthernCare set forth above, the termination is not suspicious. This is merely a

subjective opinion without substance. In addition, Hughes claims that discrimination is shown

because the person who hired him was different from the person who terminated him. However,

there is no evidence in the record as to who actually hired Hughes, and thus this allegation is

unsupported by fact.

Finally, Hughes claims that after SouthernCare terminated him, it learned others had

acted the same way he acted. There is no support in the record for this assertion. Hughes

suggests that by inference, Richard Duren's declaration suggests that he learned after Hughes'

termination that others reported mileage in the same manner as Hughes and were not terminated.

However, Hughes is mischaracterizing the declaration, and there is no evidence in the record that

Mr. Duren learned after Hughes' termination that others were reporting mileage in the same

manner as he, and were not terminated. Hughes also claims that SouthenCare did not submit

affidavits from April Henry or Patricia Pancner that they were not aware of others reporting

mileage in the same manner as Hughes. However, as noted above, Pancner's email to Lisa

Taylor  states, "Linda, Erica nor myself are not aware of anyone else in Southbend misusing

CellTrak or not following policy." (RFP 1(a) SC00002). Further, April Henry was no longer

Hughes' supervisor at the time of Hughes' termination in September 2011, so her knowledge at

that time is irrelevant.[4] (Hughes Dep. p. 53, lns. 18-21; p. 55, lns. 21-25; p. 56. lns. 1, 24-25; p. 57, lns. 1-4; 24-25; p. 58, lns.1-13, p. 113, lns. 8-15).

Another "bit and piece" of evidence which Hughes claims demonstrates discrimination is that after the June 2011 incident, he was sent home and others were not. However, after the June 8 incident, Hughes finished his normal workday and then went home. (Hughes Dep. p. 111, lns. 2-10). After the other employees involved in the incident complained about Hughes, Patricia Pancner attempted to call him that day, but they did not talk until that evening. (Hughes Dep. p. 111, lns. 9-12; p. 113, lns.16-19). It was during that call that Pancner told Hughes that he should stay home the next day. (Hughes Dep. p. 111, lns. 12-15). Hughes admits that during that conversation, he was allowed to tell Pancner his side of the story. (Hughes Dep. p. 111, lns. 10-17; p. 120, lns. 20-23). Thus, Pancner's decision to send Hughes home for any day came after other employees had complained about him, and that remained her decision after Hughes was allowed to tell her his side of the story. Further, Hughes admitted that he was in the wrong, and that Pancner's investigation was performed pursuant to SouthernCare's grievance policy because there had been a complaint. (Hughes Dep. p. 111, lns. 21-24; p. 112, lns. 1-3, 21-24; p. 113, lns. 1-4, lns. 16-25; p. 114, lns. 1-14).

As another "bit and piece" of evidence, Hughes claims that after SouthernCare

---

[4] Hughes has filed a motion to strike SouthernCare's assertion that April Henry was no longer employed by SouthernCare at the time of Hughes' termination. Hughes cites to the Chamber of Commerce Website, which he asserts shows that April Henry is the Executive Director of SouthernCare. A review of Hughes' Exhibit 1 to his motion to strike shows that Hughes is correct. As noted earlier, SouthernCare's response to the motion to strike was stricken due to belated filing. Thus, the court will disregard the statement that April Henry was no longer employed by SouthernCare. However, as there is no assertion or evidence that April Henry's knowledge during the time period in question is relevant (as she was the Executive Director), the court will not strike that portion of the statement.

terminated him, SouthernCare said he could have used home codes. There is absolutely no

evidence in the record that SouthernCare ever told Hughes that he could have used a home code.

For all of the foregoing reasons, the court finds that Hughes has failed to prove disparate

treatment under the direct method. As Hughes has failed to present a prima facie case under

either the indirect or direct method, summary judgment will be granted on Hughes'

discrimination claim.

SouthernCare also requests summary judgment on Hughes' defamation claim. Hughes

claims that SouthernCare committed defamation per se because Pancer told other SouthernCare

staff that he committed mileage fraud. SouthernCare admits that Pancer told other

SouthernCare employees about the mileage fraud, but she did so only to those who were on a

need to know basis, and thus, SouthernCare is entitled to a qualified privilege. "To accommodate

the important role of free and open intracompany communications and legitimate

human resource management needs, the qualified privilege is available to protect personnel

evaluation information communicated in good faith. The qualified privilege is a defense to a

defamation action and applies to 'communications made in good faith on any subject matter in

which the party making the communication has an interest or in reference to which he has a duty,

either public or private, either legal, moral, or social, if made to a person having a corresponding

interest or duty.'" *Bals v. Vercuzco*, 600 N.E.2d 1353, 1356 (Ind. 1992), citing to *Chambers v.

American Trans Air, Inc.* 577 N.E.2d 612, 615, (Ind. App. 1991), quoting *Elliott v. Roach*, 409

N.E.2d 661, 672 (Ind. App. 1990). To defeat the privilege, Hughes must show that Pancer was

motivated by ill will, that Pancer published the statement excessively, or that Pancer did not

believe the statement to be true. *Bals* at 1356.

In this case, Pancer made her communications to other SouthernCare employees who were involved in the decision to terminate Hughes, and who were involved in his unemployment claim. All of these disclosures were done in the context of Pancer's position as SouthernCare's clinical director and as an employee of SouthernCare. This is precisely the type of communication that the qualified privileged is intended to protect.

There is also no evidence that defeats the privilege. To the contrary, the evidence shows that Pancer's motivation was to inform others at SouthernCare as to the results of her investigation for purposes of Hughes' employment and unemployment claim. Further, Hughes testified that any ill will in Pancer's making the statements was directed to his embarrassment and being upset by his termination, not to Pancer's improper motivation. As to publication, Hughes admits that Pancer never disclosed these communications about the mileage to anyone outside of SouthernCare. As to Pancer's belief in her statement, based on the documentation that Pancer relied on, and Pancer's understanding of it as documented in her memo and email, there is no evidence that she did not believe that Hughes committed mileage fraud. She even consulted with another employee to verify her CellTrak findings.

Hughes urges the Court to find an issue of fact that precludes summary judgment on this claim and asserts that he can present evidence of a lack of good faith in the way his claim of mileage fraud was investigated. He reiterates his claim that April Henry told him it was okay for him to claim mileage reimbursement the way he did, and that SouthernCare should have investigated other employees it learned committed mileage fraud after Hughes' termination. First, there is no evidence that SouthernCare ever became aware after Hughes' termination that other employees had claimed mileage in the same manner as did Hughes. Second, even if it

failed to conduct investigations as to these other employees, it has no bearing on whether it conducted a good faith investigation into Hughes' mileage claim. As to April Henry, again, there is no evidence that those involved in the termination of Hughes knew that other employees were claiming mileage as was Hughes. In fact, the evidence is to the contrary. Thus, summary judgment will be granted on the defamation claim.

Hughes has requested punitive damages. Even if any of Hughes' claims survived summary judgment, he would not be entitled to punitive damages. To succeed on a claim for punitive damages under 42 U.S.C. § 1981a(1)(b), Hughes must show that SouthernCare engaged in a discriminatory practice with malice or reckless indifference to his federally protected rights. 42 U.S.C. § 1981a(1)(b). SouthernCare may avoid liability for punitive damages if it can show that it made a good faith effort to implement an anti-discrimination policy. *Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 482 (7th Cir. 2003).

Here there is no dispute that SouthernCare has made a good faith effort to implement an anti-discrimination policy. It has extensive policies and procedures in place for its employees to report claims of discrimination and/or harassment, which it follows as demonstrated by its investigation into the June 8, 2011, incident, and the prior Couch investigation.

Hughes argues that SouthernCare's extensive policies and procedures standing alone do not insulate it from punitive damages, because SouthernCare later discovered that other employees were reporting mileage the same way in which he did but were not terminated. Again, this mischaracterizes the declaration of Richard Duren. In Duren's declaration, all he states is that he was not aware of any other employees violating the CellTrak and mileage policies at the time of Hughes's termination. Hughes mistakenly infers that that means Duren and/or

SouthernCare became aware of such employees after Hughes's termination. That is simply not the case, and there is nothing in the record to support this conclusion. Once again, Hughes makes a subjective characterization which is unsupported by the record.

Hughes also again refers to the June 8, 2011, incident in which Hughes was disciplined. Again, Hughes admitted that he could have handled the incident better, and that he even agreed to apologize to the entire office for his conduct. He also admitted that he was permitted to present his side of the story to Pancner before he was sent home for one day, and that SouthernCare was merely following its policies and procedures in investigating the June 2011 incident. He also agreed that further violations would result in termination. Thus, contrary to what Hughes claims, SouthernCare's investigation into these two incidents was not a "sham."

Further, the facts of this case are readily distinguishable from the facts of *Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478 (7th Cir. 2003) , which Hughes cites for the authority that the issue of punitive damages should be decided by a jury.. In *Lampley*, the defendant claimed that it had a formal anti-discrimination policy, but never was able to produce a copy of it. Further, when the plaintiff complained to the defendant about race discrimination, rather than investigate the claim, it fired him, claiming that the company could not have employees going to the EEOC. The defendant also did not investigate the plaintiff's post termination retaliatory discharge claim, but rather trumped up reasons as to why the plaintiff was fired, other than for filing the retaliation claim.

Here, Hughes acknowledges that SouthernCare had an equal opportunity policy which states that it complies with all provisions of Title VII of the Civil Rights Act of 1964, and that all decisions regarding employment are made without regard to race, among other factors. (Hughes

Dep., p. 88, lns. 23-25; p. 89, lns. 1-25; p. 90, lns. 1-15; Hughes Dep. Ex. 9). Pursuant to that policy, managers and supervisory staff enforce the policy and equal opportunity posters are posted. (Hughes Dep. Ex. 9). Supervisors also receive formal training on EEOC policies, and employees are advised of the EEOC policies through the handbook. (Hughes Dep. Ex. 9). SouthernCare's harassment and discrimination policies also are documented in its employee handbook. (Hughes Dep., p. 73, lns. 21-25; p. 74, lns. 1-25; p. 75, lns. 1-22; Hughes Dep. Ex. 6). This policy also prohibits harassment and discrimination based on an individual's race, prohibits conduct demeaning to another person, and provides an investigatory mechanism. (Hughes Dep. Ex. 6).

SouthernCare also had in place procedures for reporting incidents of harassment or other employment-related concerns. (Hughes Dep., p. 75, lns. 23-25; p. 76, lns. 1-12; p. 78, lns. 22-25; p. 79, lns. 1-18; Hughes Dep. Exs. 6 and 8). Hughes acknowledged that such grievances could even be voiced anonymously by calling a hotline without fear of retaliation. (Hughes Dep., p. 79, lns. 19-25; p. 80, lns. 1-6; Hughes Dep. Exs. 6 and 8). SouthernCare's policies also provided for an investigative and disciplinary mechanism for acts motivated by or related to any form of harassment or a violation of any of SouthernCare's policies. (Hughes Dep. Exs. 3, 6, and 8; Duren Dec. ¶6).

Further, unlike in *Lampley*, SouthernCare conducted thorough investigations into the June 2011 incident and the mileage fraud in September 2011. Also, unlike the investigation that was scrutinized in *Lampley*, Hughes cannot show that SouthernCare's investigation into any race discrimination claims made by him were a sham, as he admits that he never made any complaints of this nature to SouthernCare. (Hughes Dep., p. 80, lns. 23-25; p. 81, lns. 1-8).

As there is no evidence to support a punitive damage claim, summary judgment will be granted on this claim.

## Conclusion

On the basis of the foregoing, SouthernCare's motion for summary judgment [DE 52] is hereby GRANTED.  Further, SouthernCare's motion to strike [DE 72] is hereby GRANTED.

Further, Hughes' motions to strike [DE 73 and DE 75] are hereby DENIED.


Entered: September 29, 2014.


s/ William C.  Lee
William C. Lee, Judge
United States District Court